ODOM, Justice.
 

 Plaintiff sued his wife for divorce on the ground of adultery and in the alternative for separation from bed and board on the ground of cruel treatment. Three of the ten children of the marriage are minors, and he prayed for judgment giving him custody of the minors.
 

 Plaintiff alleged that since their marriage his wife had been guilty of adultery on various occasions, and particularly on April 10, 1939, she had committed adultery with a man named E. C. King at the Benart Hotel in the City of Houston, Texas; that on various occasions, the dates of which were unknown to him, his wife had made dates with other men, and that “she has used her children, namely: George Adams, Binford Adams and Bobbie Adams to carry notes to various men making dates which she fulfilled”; that at various times, “the dates of which are unknown to your petitioner, his said wife has been seen in the company of various men in the City of Houston, Texas”.
 

 Paragraph 8 of plaintiff’s petition reads as follows : “That your petitioner has been recently informed of the misconduct on the part of his said wife, as outlined in this petition, and since receiving this information has not lived with her as man and wife.”
 

 He further alleged that on the 3rd day of June, 1939, he was “suspicious of his wife’s misconduct and was informed that his son had received a letter from Houston relative to his wife’s misconduct in Houston, Texas, on April 10, 1939”, and that he demanded to see the letter and his wife refused to let him have it, and that she on that occasion “proceeded to curse and abuse your petitioner. That your petitioner left the house and has not returned since”.
 

 Plaintiff further alleged that on April 23, 1939, his wife informed him that she had received a letter from their married daughter living in Houston, inviting her, his wife, to attend a quilting party, and that his wife stated that she was going to attend, and that she left home and was absent two nights and a day and after her return informed him that she had attended the
 
 *467
 
 party, but that as a matter of fact she had not done so. He further alleged that on the 30th day of May, 1939, his wife stated to him that their daughter had written her to come to Houston “as she wanted to talk to her”, and that his wife, instead of going to Houston, went by train in an easterly direction from their home in DeQuincey, Louisiana.
 

 Defendant answered, denying each and every act of misconduct charged against her by her husband. And, assuming the position of plaintiff in reconvention, she alleged that she had always conducted herself properly and had given her husband no cause or provocation for complaint; that she had done all she could to make him comfortable and happy, and that, notwithstanding this, her husband had for many years been jealous of her, had accused her of misconduct.without cause, had quarreled at, cursed, and abused her, and had ill treated her in the presence of their family and guests; and that on June 2, 1939, at their residence her husband made an attempt upon her life with a gun and threatened to shoot her, and that his actions at that time were so threatening that she had him arrested.
 

 She prayed that her husband’s demands be rejected and that she have judgment against him in reconvention, decreeing a separation from bed and board, and that she be given the custody of the minor children.
 

 There was judgment rejecting plaintiffs demand fo'r divorce on the ground of adultery but granting him a separation from bed and board on the ground of cruelty. From this judgment the wife appealed. Plaintiff answered the appeal, praying that the judgment be affirmed.
 

 Plaintiff and defendant had been married 31 years when this suit was filed. Ten children were born of their union, eight of whom are living, three being minors. The wife was 49 years old at the time- of the separation. Over defendant’s objection, plaintiff was permitted to testify that, when their youngest child was six months old, his wife admitted to him. that she had been guilty of adultery. This, according to the record, was about 11 years before the separation took place. He said that, notwithstanding such admitted conduct on the part of his wife, he continued to live with her until June 2, 1939. The trial judge correctly held that the husband, by living with his wife, had condoned such misconduct as he says she had admitted. The trial judge stated in his written' opinion that plaintiff had failed to prove that his wife had been guilty of adultery on subsequent occasions. We concur in his ruling on that point. But the judge was of the opinion that the wife had within recent years been guilty' of misconduct which amounted to cruelty in law, and that. the husband was entitled to a separation from bed and board under Article 138 of the Revised Civil Code, which provides that either spouse is entitled to a separation from bed and board on account of “cruel treatment, or outrages of one of them towards the other, if such habitual intemperance, or such ill treatment is of such a nature as to render their living together insupportable”.
 

 
 *469
 
 In his written opinion the judge stated: “For a wife to consort with, to have dates with, and to carry on an affair with a single man or men is cruelty such as will warrant a judgment for separation.”
 

 We find it unnecessary to discuss the question whether a wife is guilty of such cruelty toward her husband as is mentioned in Article 138 of the Revised Civil Code if she consorts with or has dates with or carries on an affair with a single man or men, in cases where the testimony fails to show that she was ever guilty of adultery. It suffices to say that, if it be conceded that such conduct does amount to cruelty, the plaintiff in this case has failed to show by satisfactory testimony that his wife was in fact guilty of such conduct.
 

 The most serious complaint which plaintiff makes against his wife is that mentioned in Paragraph 5 of his petition, where he alleged that she committed adultery with E. C. King at a hotei in the City of Houston on April 10, 1939. Plaintiff utterly failed to make proof of this allegation.
 

 The testimony shows that E. C. King is a married man, living with his wife in the City of Houston; that he is a conductor on a passenger train which runs from New Orleans to that city; that on or about the date mentioned plaintiff’s wife was in Houston and that she met Mr. King on the streets of that city, and that, while she was in conversation with him, Mr. King’s wife drove up in an automobile, picked up the defendant, and took her to Mrs. King’s home. There is no testimony in the record which shows or even indicates that Mr. King and the defendant ever met at a hotel or elsewhere in Houston except on the street on the one occasion just referred to.
 

 Mrs. King and the defendant, Mrs. Adams, had been close personal friends for many years, the two having been frequently engaged in church work together at De-Quincey, Louisiana, where plaintiff and defendant resided at the time of their separation and where the Kings formerly' resided. They frequently visited each other while living at DeQuincey. Mrs. King never at any time suspected that any improper relations existed between her husband and her friend, Mrs. Adams.
 

 The friendly relations between Mrs. King and Mrs. Adams continued down to the date of the trial, as is evidenced by the fact that Mrs. King testified as a witness for Mrs. Adams at the trial. Mrs. King’s testimony clears -up to our entire satisfaction certain alleged acts of misconduct on the part of Mrs. Adams toward Mr. King, which acts of misconduct are relied upon by the plaintiff to show cruelty and are referred to by one or two of the Adams children, who testified for their father.
 

 Bobbie Adams, the 13-year-old son of plaintiff and defendant, who testified for his father, was asked whether he knew of any misconduct by his mother with Mr. King. He said that he did and was asked to state what the acts of misconduct were. His explanation was that he had carried letters and notes written by his mother to Mr. King and also at his mother’s request had carried lunches to Mr. King, delivering
 
 *471
 
 the notes and the lunches to him at the railroad station in DeQuincey. He did not say that he read the notes or knew their contents, but stated that the letters or notes were put into small packages which he inferred were lunches and that he had delivered these packages to Mr. King at his mother’s request. He did not say when this took place, but did testify positively that he did not tell his father about it until after the separation on June 2, 1939.
 

 Mrs. Adams testified that she had frequently delivered to her son Bobbie, and possibly to one of her other children, packages containing notes, with the request that they be delivered to Mr. King. But she testified that the packages were for Mrs. King, and that the notes were addressed to, and were for, her, and were delivered to Mr. King with the request that he carry them to Houston and deliver them to his wife. She said that she and Mrs. King were warm personal friends and that the packages contained vegetables from her garden, fruits, a birthday cake, or such other delicacies as she thought Mrs. King would enjoy, and that the notes were all addressed to Mrs. King and had reference to the small courtesy gifts which she was sending. Bobbie Adams testified that on one occasion his mother had sent Mr. King a scarf as a present. Mrs. Adams admitted that she on one occasion sent a package to Mr. King, which package contained a scarf as a Christmas present to him and a pair of silk hose for Mrs. King, and testified further that the scarf was a present from Bobbie to Mr. King, and that. the reason her son Bobbie wanted to present Mr. King with a small gift was that Mr. King on a former occasion had given Bobbie a pair of pigeons, and that the gift from Bobbie to Mr. King was to express his gratitude for the pigeons.
 

 The testimony of Mrs. Adams with reference to these packages and notes was corroborated in every detail by Mrs. King, the wife of the man with whom plaintiff alleged that his wife had consorted. Mrs. King testified that the packages with the notes enclosed were brought and delivered to her by her husband. Mr. King did not testify as a witness. We therefore accept the testimony of Mrs. Adams and Mrs. King as explanation of the alleged misconduct about which Bobbie Adams testified.
 

 As we have stated, there is no testimony whatever to show that Mrs. Adams, the defendant, and Mr. King met at the hotel in Houston on April 10, 1939. We infer from plaintiff’s testimony that he intended to prove that allegation by his married daughter, who lives in Houston, but his daughter, although within the jurisdiction of the court whén the case was tried, did not testify.
 

 George Adams, another son of plaintiff and defendant, who was 20 years old at the time of the trial, was asked whether he knew of any misconduct on the part of his mother toward Mr. King, and said that he did. He was asked to explain what that misconduct was, and stated that about the year 1936 — or something like three years prior to the separation- — he went to the train on which Mr. King was conductor “to follow Mr. King and spy on him and a lady” who was supposedly being per
 
 *473
 
 mitted to ride on the train without paying passenger fares. He said his mother was jealous of this woman and that she had taken upon herself the job of being a spy or spotter for the railroad company, and that she wrote a letter to Mr. King suggesting that he be particular or he would lose his position as conductor, but that his mother did not sign the letter. He stated that at his mother’s request he had copied the letter on a typewriter and had delivered it to Mr. King. He testified that he did not tell his father of this until after the separation.
 

 This witness testified further that he had delivered notes written by his mother to a man named 'Smith, who was town marshal, almost every day for a year. He did not say when this was, but did state that he did not tell his father about it until after the separation. Mr. Smith was called as a witness for the defendant and stated positively that he had never at any time received a note or letter from Mrs. Adams, but that he had received one threatening letter from Mr. Adams, which letter he had delivered to a justice of the peace. The letter was not produced, and there is nothing to show when it was written. The plaintiff, Mr. Adams, after hearing Mr. Smith testify, was recalled and was asked:
 

 “Q. You heard the testimony of Mr. Smith in which he stated you wrote him a threatening letter. Did you ever write Mr. Smith a letter? A. No sir.”
 

 There is no testimony to show, or even to indicate, that Mrs. Adams ever met or associated with Town Marshal Smith except in a social way in the presence of other people.
 

 The witness Bobbie Adams stated further that on one occasion, the date of which he did not remember except that it was about a year before the separation, he, with his mother, his sister Dorothy, and his friend Bryan Welsh, made a trip together to the City of New Orleans, and that his mother left him and the others at Lee Circle, where she and Mr. King got into a taxi, drove away, and stayed for about two hours; that he did not know where they went or what they did, but that the next he saw of his mother was at the Union Station where they all boarded the train for DeQuincey, their home. His testimony was corroborated by that of his friend Bryan Welsh. While Bobbie Adams stated that Mr. King was conductor on the train, the Welsh boy was not asked whether Mr. King was conductor on that train, but did say that Mrs. Adams left Lee Circle in a cab with Mr. King.
 

 Dorothy Adams, Bobbie’s twin sister, testified that a Mr. Hill, and not Mr. King, was conductor on that train. Her testimony to this extent contradicts that of her brother. She was not asked whether her mother and Mr. King left Lee Circle together in a cab.
 

 Mrs. Adams, the defendant, testified that she made the trip to New Orleans with her son Bobbie, her daughter Dorothy, and the Welsh boy, and that Mr. King “was not on the run at that time”, but that the train was in charge of Mr. Hill as conductor.
 

 
 *475
 
 Albert Louis Adams, the 26-year-old son of plaintiff and defendant, who lives in Houston, testified that on July 5, 1938, he and his wife saw his mother on a street near the Union Station in Houston in company with Mr. King; that his mother saw him but pretended that she did not recognize him. He was shown a letter dated July 7, 1939, two months after the separation, written by Mr. E. C. King to the plaintiff, A. G. Adams, and was asked whether a portion of the letter was not in his mother’s handwriting. He stated that it was, and according to the transcript he marked that portion of the letter which he said was in his mother’s handwriting. The original of that letter was not brought up in the transcript, but we find it copied in the record. There is nothing in the record to show which part of the letter the witness marked as being in the handwriting of his mother. According to this letter, Mr. King had learned that some of the Adams children had been to Houston, apparently for the purpose of' finding out whether there had been improper relations between him and Mrs. Adams in that city. Mr. King in that letter specifically disavowed any improper relations between him and Mrs. Adams in Houston or elsewhere, and stated to Mr. Adams that he would like to meet him and talk the matter over and would also like for Mr. Adams to talk with Mrs. King. Mr. King suggested that he would be on the train which runs through DeQuincey on a certain day and invited Mr. Adams to meet him for the purpose of-discussing these rumors, assuring Mr. Adams that they were unfounded and that he thought Mr. Adams would be convinced of that fact after the conversation.
 

 Mrs. Adams, the defendant, testified positively that she had not written any part of the letter, that she had never seen it and in fact knew nothing about it until the trial.
 

 We are not impressed with the testimony that Mrs. Adams wrote any part of that letter. She knew, of course, that her husband, to whom the letter was addressed, would recognize her handwriting, and it is unbelievable that she should so clearly have apprised her husband that she was in collusion with Mr. King in his attempt to assuage her husband’s suspicions.
 

 Plaintiff called two witnesses, a Mr. Smith (not the town marshal above mentioned) and a Mr. Rainwater, each of whom testified that Mrs. Adams’ reputation for morals in the Town of DeQuincey was not the best.
 

 We are not impressed with the testimony of the Adams children relating to the alleged misconduct of their mother. It is inconceivable that, if Mrs. Adams was guilty of such misconduct with other men as her children described, she would have, permitted them to be witnesses to such misconduct. If she had wanted to carry on a clandestine. correspondence with the town marshal, Smith, or with the conductor, King, it is hardly probable that she would have entrusted the letters to her own children, ■ who were old enough to take notice of such matters. Nor is it probable that, if she was intimate with the man King and, as suggested, was having “an affair”'
 
 *477
 
 with him, she would have permitted two of her children, one her 12-year-old daughter Dorothy, to witness the scene which her son Bobbie said took place at Lee Circle in New Orleans. To accept plaintiff’s theory, we would have to believe that Mrs. Adams had lost all sense of decency, that she had become so degraded morally that she was willing for her own children to witness her degradation.
 

 The record does not warrant such belief, although it must be said that she was probably not as discreet as she should have been and that her conduct through the years, however innocent of wrongdoing she may have been, had been such as to create some unfavorable comment in the community.
 

 But plaintiff did not abandon his wife on account of her conduct about which he now complains, for he testified positively that he knew nothing about it until after the separation and was then informed of it, not by outsiders, but by his 'own children. He was never humiliated by her conduct. If she had been guilty of immoral association with other men, he had suffered no pain or mental anguish because of such conduct, for he knew nothing about it. Plaintiff was in DeQuincey, where he and his wife lived, all the time, and it is reasonable to assume that, if his wife’s conduct with other men had been so scandalous and so humiliating to him as to amount to cruelty, he would have known of it. '
 

 In the case of Holmes v. Holmes, decided by this court on January 10, 1898, reported in 23 So. 324, and also as Appendix 7 in 50 La.Ann., page 768, National Reporter System Edition, plaintiff sued her husband for separation from bed and board, her claim for relief being founded upon alleged excesses, cruel treatment, and outrages on the part of her husband, his assault upon her, and his attempt to take her life. She alleged that her husband had been guilty of illegal and immoral association with a certain married woman in the city who was not living with her husband, and that such association had covered a period of seven years immediately preceding the filing of the suit. She further alleged that by reason of said illegal and immoral association her husband gave no time or attention to his family, that he neglected her and their children, that he had cast opprobrium upon her and them by his conduct and thereby deprived them of the benefits which should be theirs in good society, and that his conduct had rendered their further living together as man and wife insupportable. She claimed separation under Paragraph 3, Article 138 of the Revised Civil Code. Her contention was that her husband’s conduct toward her amounted to cruelty. This court upheld her contention and decreed a separation from bed and board.
 

 The facts in that case disclosed that the defendant began, about seven years prior to the separation, openly to devote his attentions almost exclusively to this married woman; that he not only visited her regularly but went out with her on numerous occasions, and that his conduct with her was such as to cause comment in .the community and to arouse the suspicions not only of the wife but of her friends and acquaintances that immoral relations ex
 
 *479
 
 isted between defendant and this married woman. The testimony showed that plaintiff had remonstrated with her husband, asking him to cease such conduct and stating to him that his conduct was such as to humiliate, embarrass, and depress her. The testimony disclosed that the husband refused to heed his wife’s pleadings and that he announced to her that he expected to continue his relations with this married woman, stating that his conduct with her was not immoral. This conduct on the part of the husband was such as to cause a separation between him and his wife, although they lived under the same roof for seven years longer, during which time their marital relations were severed completely. As a climax, the plaintiff, in company with her two daughters and some friends, met her husband in company with said married woman on a prominent street in New Orleans, where the following scene took place, as described by one of the witnesses :
 

 Mrs. Holmes saw her husband and the said married woman walking together, and accidentally Mrs. Holmes’ cape “touched that lady, who drew back in a crouching way, close to Mr. Holmes, exclaiming, ‘Mrs. Holmes!’ Whereupon Mrs. Holmes said,'‘Yes; this is Mrs. Holmes,’ and, turning towards her husband, said, ‘Is this the way you are in the habit of spending your evenings?’ Mr. Holmes then, with a little cough, remarked, ‘Well, not exactly, but we enjoy it exceedingly.’ The lady, taking courage from his words, repeated the words of Mr. Holmes by saying, ‘We do, indeed, enjoy it exceedingly,’ and, turning in a very • sneering way to Mrs. Holmes, said, ‘How do you like it ?’ And Mrs. Holmes, with her fist in the lady’s face, answered, ‘Mrs. * * Then she said, ‘Why! that horrible woman has struck me.’ And then, taking courage, she sprang towards Mrs. Holmes, as if she was going to hit her, when Mr. Holmes raised his stick, and said, ‘Take this stick, and give her hell, and knock her damn brains out.’ ”
 

 The court, having found that the husband’s relations with the married woman in question were open and aboveboard continuously for seven years, to the knowledge of his wife, their children, and her friends, and were of such a character as to cause the spouses to draw apart and finally to separate, culminating in the scene on the street described above, expressed the opinion that such conduct on the part of the husband toward his wife was cruelty as that term is used in Article 138 of the Revised Civil Code; that it was cruelty because it constantly humiliated and depressed the wife, and deprived her and her children, two of whom at least were daughters, of the benefits which should have been theirs in good society, and deprived the wife of the comforts and security of a pleasant and happy home to which she was entitled. The court found that the home was broken up because the husband persistently refused to abandon his relations with the other woman and proclaimed that he would cling to her even though his home would be broken up by such relations.
 

 The court said that such conduct was the “refinement of cruelty”.
 

 That was an extreme case, the only one of its kind we find in our reports. The
 
 *481
 
 case at bar discloses no such conditions. We do not concur in the view expressed by the trial judge that plaintiff is entitled to a separation from bed and board on the ground of cruel treatment and excesses.
 

 ' The judgment in favor of plaintiff and against defendant for separation from bed and board is reversed and set aside, and plaintiff’s suit is dismissed at his costs.